**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

DANNY FARRINGTON,

                                    Plaintiff,                       9:22-cv-00356
                                                            (AMN/CFH)

v.

SGT. MICHAEL POOLE, C.O. HEATH FURBECK, C.O.
JOSEPH HALEY, C.O. ANDREW COHEN, C.O.
PADRAIC LYMAN, C.O. ERIK GETTINGS, C.O.
VINCENT LIVRERI and C.O. DAVID DOLLARD,

                                    Defendants.

_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **SIVIN, MILLER & ROCHE** | **EDWARD SIVIN, ESQ.** |
| 20 Vesey Street, Suite 1400 | **DAVID ROCHE, ESQ.** |
| New York, NY 10007 | **GLENN D. MILLER, ESQ.** |
| _Attorneys for Plaintiff_ | |
| | |
| **ALBANY COUNTY ATTORNEY'S OFFICE** | **KEVIN MCDONALD** |
| 112 State Street | **CANNIZZARO, ESQ.** |
| Albany, NY 12207 | Assistant Albany County Attorney |
| _Attorneys for Defendants_ | |

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

      On April 14, 2022, Plaintiff Danny Farrington ("Plaintiff") commenced this action

pursuant to 42 U.S.C. § 1983 ("Section 1983"), asserting claims arising out of his confinement in

the custody of the County of Albany at Albany County Correctional Facility ("ACCF"). Dkt. No.

1.[1]  Plaintiff alleges that Sergeant Michael Poole ("Defendant Poole"), Corrections Officer Heath

---

[1] Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic
filing system.

Furbeck ("Defendant Furbeck"), Corrections Officer Joseph Haley ("Defendant Haley"), Corrections Officer Andrew Cohen ("Defendant Cohen"), Corrections Officer Padraic Lyman ("Defendant Lyman"), Corrections Officer Erik Gettings ("Defendant Gettings"), Corrections Officer Vincent Livreri ("Defendant Livreri"), and Corrections Officer David Dollard ("Defendant Dollard") (collectively, "Defendants") violated Plaintiff's Eighth and Fourteenth Amendment rights on May 21, 2020 by using excessive force against Plaintiff, which Defendants participated in or observed without intervening to varying degrees. *Id.* at 5. Plaintiff also alleges that Defendants Poole and Furbeck later violated Plaintiff's First Amendment rights when they issued Plaintiff an inmate disciplinary report containing false allegations. *Id.* at 5-6.

Presently before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), seeking dismissal of the Complaint in its entirety. Dkt. No. 48 (the "Motion").[2] Plaintiff opposes the Motion, Dkt. No. 59, and Defendants filed a Reply in support of the Motion, Dkt. No. 60. For the reasons set forth below, the Court grants in part and denies in part the Motion.

## II.    BACKGROUND

### A.  Undisputed Facts

Unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response.

Plaintiff's claims against Defendants stem from an incident that occurred on May 21, 2020, while Plaintiff was incarcerated at ACCF. Dkt. No. 48-21 at ¶¶ 4-8; Dkt. No. 59-12 at ¶¶ 4-8. Plaintiff was first incarcerated at ACCF as a parole violator for failing to report a change of his

---

[2] This case was reassigned to the undersigned on January 19, 2023. Dkt. No. 34.

address.  Dkt. No. 48-21 at ¶ 1; Dkt. No. 59-12 at ¶ 1.  At the time, Defendant Poole was a supervisor in charge of three of ACCF's housing buildings, including the building that housed Plaintiff.  Dkt. No. 48-21 at ¶ 10; Dkt. No. 59-12 at ¶ 10.  Plaintiff was housed "on the second tier" of the relevant housing building, meaning he had to climb stairs to get to his cell from the bottom floor.  Dkt. No. 48-21 at ¶ 13; Dkt. No. 59-12 at ¶ 13.  Prior to May 21, 2020, Plaintiff and Defendant Poole had no familiarity or personal relationship with one another.  Dkt. No. 48-21 at ¶ 12; Dkt. No. 59-12 at ¶ 12.

On May 21, 2020, Defendant Poole was conducting a supervisory round in Plaintiff's housing building when he claims he noticed the smell of smoke in the air.  Dkt. No. 48-21 at ¶ 18; Dkt. No. 59-12 at ¶ 18.  ACCF rules and regulations prohibit any form of smoking.  Dkt. No. 48-21 at ¶ 19; Dkt. No. 59-12 at ¶ 19.  After noticing the smell, Defendant Poole asserts he "made clear to the inmates on the tier that someone had better remedy the situation" and that his statements constituted a "directive."  Dkt. No. 48-21 at ¶¶ 21, 23.  Plaintiff alleges he could not understand Defendant Poole's first statement regarding the smoke and that it was unclear that Defendant Poole had made any sort of direct order.  Dkt. No. 59-12 at ¶¶ 21, 23.  Defendant Poole then turned off the television on the first tier, which Plaintiff was using, and ordered all the incarcerated individuals to "lock in" to their cells.  Dkt. No. 48-21 at ¶¶ 15, 23; Dkt. No. 59-12 at ¶¶ 15, 23.

After giving the direct order to "lock in," Defendant Poole observed the incarcerated individuals begin to return to their cells.  Dkt. No. 48-21 at ¶ 24; Dkt. No. 59-12 at ¶ 24.  At this point, Plaintiff walked up to Defendant Poole as he reached the bottom of the stairs.  Dkt. No. 48-21 at ¶ 25; Dkt. No. 59-12 at ¶ 25.  While near Defendant Poole at the bottom of the stairs, Plaintiff said "this is fucked up."  Dkt. No. 48-21 at ¶¶ 25-26; Dkt. No. 59-12 at ¶¶ 25-26.  Plaintiff

explained he felt that the "lock in" order was "Peter paying for Paul bullshit."   Dkt. No. 48-21 at ¶ 27; Dkt. No. 59-12 at ¶ 27.  The parties dispute what happened next.

## B.  Defendants' Version of Events

As to what happened next, Defendants assert the following sequence of events.  First, Plaintiff quickly approached Defendant Poole's personal space and continued to angrily yell in the officer's face while taking on an aggressive posture.  Dkt. No 48-21 at ¶ 28.  Defendant Poole then gave a second direct order for Plaintiff to go to his cell.  *Id.* at ¶ 30.  Recognizing the situation was escalating, Defendant Poole drew his taser in an attempt to gain Plaintiff's compliance but quickly placed it back in his holster.  *Id.* at ¶¶ 31-32.  Plaintiff then continued to walk up the stairs, stopped in a threatening manner, and threatened to "shove that taser in [Defendant Poole's] ass."  *Id.* at ¶¶ 32, 37.  Defendant Poole followed Plaintiff up the stairs and directed him up the staircase using soft hand techniques because he wanted to get Plaintiff off the staircase so that in the event the incident escalated, he would not have to fight on the uneven stairwell.  *Id.* at ¶¶ 39, 40.  As the two got to the top of the staircase, Plaintiff turned towards Defendant Poole and "planted his right foot."  *Id.* at ¶ 41.  Based on his experience as a corrections office, Defendant Poole believed Plaintiff appeared ready to fight.  *Id.* at ¶ 44.  In order to regain control of the situation, Defendant Poole grabbed Plaintiff and got him to the floor.  *Id.* at ¶ 45.  Defendant Furbeck assisted Defendant Poole in bringing Plaintiff to the ground.  *Id.* at ¶ 46.  Someone sounded the emergency alarm, which indicated that officers were in distress and struggling with an incarcerated individual.  *Id.* at ¶ 47.  While the alarm was continuing, Defendants Poole and Furbeck continued to struggle with Plaintiff on the ground, tried to turn him onto his stomach and attempted to place handcuffs around his wrists to gain control.  *Id.* at ¶¶ 50-52.  This was difficult because Plaintiff's hands were

4

underneath his body during the majority of the incident.  *Id.* at ¶ 54.  Each of the remaining Defendants were on duty and responded to the alarm.  *Id.* at ¶ 62.

Defendant Livreri arrived and saw Plaintiff on his stomach, struggling on the ground, and holding his arms tight to his chest.  *Id.* at ¶ 68.  Defendant Livreri warned Plaintiff that if he didn't turn around, he would get pepper sprayed.  *Id.* at ¶ 69.  Subsequently, Defendant Livreri pepper sprayed Plaintiff twice in the face, using one second sprays, and attempted to rip his arms from under his body to handcuff him.  *Id.* at ¶¶ 70-71.  After the use of pepper spray, Plaintiff was subdued and eventually handcuffed.  *Id.* at ¶ 73.

Defendant Lyman also responded to the alarm, and when he arrived, he saw no more than four officers on the scene.  *Id.* at ¶ 79.  He heard those officers telling Plaintiff to "put his hands behind his back and stop resisting."  *Id.* at ¶ 80.  After going up the stairs, Defendant Lyman saw Plaintiff "actively resisting" by wiggling and refusing to give up his hands to be restrained.  *Id.* at ¶ 82.  Defendant Lyman then helped move Plaintiff's left arm behind his back so that handcuffs could be applied.  *Id.* at ¶ 83.

Defendant Dollard similarly responded to the alarm, noticed a group of officers crowded in one area, and heard officers giving verbal commands of "stop resisting."  *Id.* at ¶¶ 87-88.  Defendant Dollard then moved up the staircase and noticed Plaintiff on the ground and officers attempting to get his hands behind his back to be handcuffed.  *Id.* at ¶¶ 90-91.  Defendant Dollard then attempted to get Plaintiff's hand out from underneath him and held Plaintiff's head still.  *Id.* at ¶ 92.

Defendant Cohen was also one of the officers who responded to the alarm, and when he arrived, he noticed Plaintiff "physically resisting efforts to be handcuffed by staff."  *Id.* at ¶¶ 95-97.  Defendant Cohen attempted to assist the other officers and delivered hand strikes to Plaintiff's

upper torso area and left arm because he believed Plaintiff was possibly reaching for a weapon. *Id.* at ¶ 100. Prior to delivering the strikes, Defendant Cohen and the other officers continued to yell "stop resisting" and "give up your hands." *Id.* at ¶ 101.

Defendant Gettings similarly arrived at the scene of the incident in response to the alarm, *id.* at ¶¶ 105-108, and assisted the other officers by holding Plaintiff's shoulders while he was on the ground struggling, *id.* at ¶ 109. After Plaintiff was handcuffed, some of the officers escorted him down the stairs. *Id.* at ¶ 110. At the bottom of the stairs, Plaintiff began resisting again, and Plaintiff was brought to the ground again. *Id.* at ¶ 111. Officers gave additional commands to stop resisting, and Defendant Gettings delivered three knee strikes to Plaintiff's "upper right arm, and shoulder area." *Id.* at ¶ 113.

Finally, Defendant Haley arrived at the incident in response to the alarm, and during the incident, held Plaintiff's ankles while other Defendants were attempting to handcuff him. *Id.* at ¶ 117. After the incident, Defendant Haley assisted in escorting Plaintiff off the housing unit and to the medical unit where he was placed in the shower to remove any pepper spray. *Id.* at ¶ 118. After receiving medical attention, Plaintiff was transported to the special housing unit and Defendant Furbeck issued him a disciplinary report charging him with a number of violations. *Id.* at ¶¶ 125-26.

### C. Plaintiff's Version of Events

In contrast, Plaintiff puts forward the following version of events which is similar in structure but differs in key details. After Defendant Poole issued the directive for incarcerated individuals to return to their cells, Plaintiff waited at the bottom of the staircase for Defendants Poole and Furbeck to descend so that he could then ascend the staircase towards his cell. Dkt. No. 59-12 at ¶¶ 25, 28. As a result of this waiting, Plaintiff was necessarily brought into the same

space as Defendants Poole and Furbeck when he voiced his disagreement with the order. *Id.* at ¶ 28. Plaintiff did not approach Defendant Poole for the purpose of voicing his displeasure, but rather, did so to comply with the order and walk towards his cell. *Id.* at ¶ 25. After descending the stairs, Defendants Poole and Furbeck heard Plaintiff make another comment, and afterwards, turned back and began approaching Plaintiff, who remained near the bottom of the staircase. *Id.* at ¶ 28. Defendant Poole confirmed to Plaintiff that "Yes, sir, it is [Peter paying for Paul]," pulled out his taser, held it within inches of Plaintiff's face, and began asking, in sum and substance, "what the fuck is wrong with you?" *Id.* at ¶¶ 30, 31. Defendant Poole did these actions out of anger, not in an attempt to force Plaintiff's compliance. *Id.* Defendant Poole then placed the taser back in its holster and issued a second order to Plaintiff to return to his cell, though Plaintiff was already walking away towards his cell. *Id.* In response to the order to return to his cell, Plaintiff said to Poole that "it wasn't [Plaintiff's] cell, it was [Defendant Poole's]." *Id.* at ¶ 32. Plaintiff never said he wanted to "shove that taser in [Poole's] ass" or otherwise threatened Defendant Poole. *Id.* Plaintiff never stopped in a threatening manner, but rather, turned briefly so that Defendant Poole could hear his complaints. *Id.* at ¶ 37.

Plaintiff continued up the stairs with his back turned to Defendant Poole. *Id.* at ¶ 38. Defendant Poole then decided to follow Plaintiff up the stairs despite the fact that Plaintiff was already walking towards his cell. *Id.* at ¶ 39. At the top of the staircase, Plaintiff walked "normally" toward his cell and did not turn towards Defendant Poole. *Id.* at ¶ 43. Defendant Poole was on Plaintiff's right side in a perpendicular position and grabbed Plaintiff by the collar before throwing him to the ground. *Id.* Defendant Poole had no reason to believe Plaintiff was ready to fight him because Plaintiff never assumed a fighting position. *Id.* at ¶ 44. Throughout the entire series of events leading to this point, Plaintiff was merely complying with Defendant Poole's order

while vocally disagreeing with it. *Id.* at ¶ 45. Therefore, Defendant Poole had no reason to assault him to "regain control," but instead, assaulted him out of anger. *Id.*

Once brought to the ground, Plaintiff did not actively struggle with Defendants because Defendants had him squarely under control on the ground. *Id.* at ¶ 51. Defendant Furbeck rolled Plaintiff onto his stomach and Plaintiff curled his arms into his chest to protect himself from the officers' blows. *Id.* at ¶ 53. Defendant Furbeck held his outstretched arms against Plaintiff while he was on the ground. *Id.* at ¶ 55. Around the same time, Defendant Poole stepped on Plaintiff's head and placed his entire hand over Plaintiff's face. *Id.* at ¶ 56.

When Defendant Livreri arrived, he told Plaintiff to "turn around [or] you're going to get sprayed," but Plaintiff was already on the ground and was being restrained by Defendants Poole and Furbeck. *Id.* at ¶ 69. Defendant Livreri then used pepper spray on Plaintiff's face, applied multiple forceful knees to Plaintiff's head and upper body, and grabbed Plaintiff by the back of the neck when Plaintiff was already under the officers' control. *Id.* at ¶ 70. When Defendant Lyman arrived, Plaintiff was pinned down on the ground by four officers and was unable to resist or give up his hands for handcuffing. *Id.* at ¶ 82. Defendant Lyman then held Plaintiff's shoulders down. *Id.* at ¶ 83. Defendant Dollard arrived and kneeled on Plaintiff's head despite witnessing another officer both holding Plaintiff's head down and punching Plaintiff in the head twice. *Id.* at ¶ 92. Defendant Haley also kneeled on Plaintiff's head while the officers attempted to handcuff Plaintiff. *Id.* at ¶ 117. Defendant Cohen arrived after Plaintiff's hands were already outstretched, and Plaintiff thereafter placed his hands above his head for handcuffing. *Id.* at ¶ 98. Defendant Cohen punched Plaintiff in the back two to three times then punched Plaintiff's arm repeatedly. *Id.* at ¶ 100. After Plaintiff was handcuffed and escorted down the stairs, Defendant Poole said "right here," indicating a spot near the bottom of the staircase. *Id.* at ¶ 111. Plaintiff was picked

up by his arms and thrown to the floor, causing his head to hit the floor. *Id.* at ¶¶ 111-112.  At this point, Officer Gettings delivered three knee strikes to Plaintiff's upper right arm and shoulder area. *Id.* at ¶ 113.

After the incident, Plaintiff was taken to receive medical treatment, and he still receives treatment for the injuries he suffered. *Id.* at ¶ 125.  Approximately one year prior to the incident, in February 2020, Defendant Poole was disciplined for punching another incarcerated individual in the head at ACCF and received a thirty-one-day unpaid suspension. *Id.* at 45.  And approximately thirty days after the incident, Defendant Furbeck came to Plaintiff's cell and apologized. *Id.*

### III.    STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).  A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).  "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter

of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. V. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV.    DISCUSSION

Defendants argue that Plaintiff's Section 1983 claims against them should be dismissed for a number of reasons, including that: (1) Plaintiff has not stated a claim under the First Amendment; (2) Plaintiff failed to raise an issue of fact as to each Defendant's personal involvement in the constitutional violation; (3) Plaintiff has not raised an issue of fact as to whether Defendants' force meets the required standards under the Eighth and Fourteenth Amendments; and (4) Defendants are entitled to Qualified Immunity. The Court addresses these arguments in turn.

### A.  Unopposed Dismissal of First Amendment Claims

Plaintiff does not oppose the Motion as to his First Amendment claims against Defendants Poole and Furbeck. Dkt. No. 59-13 at 11 n.1. However, "[e]ven when a motion for summary judgment is unopposed, the [Court] is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*,

373 F.3d 241, 242 (2d Cir. 2004).  Even so, the Court is satisfied that Plaintiff, by his own admission, has failed to raise a disputed issue of material fact as to the First Amendment claims. *See generally* Dkt. No 48-12 at 111:17-112:17.  The Court grants the Motion as to the First Amendment claims and dismisses the claims from the case.  *See, e.g., DeJohn v. Wal-Mart Stores East, LP*, No. 5:09-CV-01315 (GTS/ATB), 2013 WL 1180863, at *5 (N.D.N.Y. Mar. 20, 2013) (dismissing claim where Plaintiff's testimony revealed no basis for sustaining claim); *Schwartz v. Allstate Ins. Co.*, 20-CV-79 (JMA), 2023 WL 2742059, at *13 (E.D.N.Y. Mar. 31, 2023) (dismissing retaliation claim because admitted facts revealed no basis for the claim).

### B.  Personal Involvement Prerequisite

Next, Defendants argue that Plaintiff is unable to precisely connect each of the physical injuries he suffered to a specific defendant, and therefore, Plaintiff cannot prove Defendants' personal involvement in the violation of his constitutional rights as a matter of law.  Dkt. No. 48-22 at 12.  Defendants' position has no basis in the law.

To establish liability against an official under Section 1983, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation.  *See Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016).  "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal citations omitted).  "[P]ersonal involvement is a question of fact." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986).

However, Plaintiff is not required to identify which specific Defendant(s) caused his specific injuries.  Dkt. No. 48-22 at 12.  To the contrary, courts in this circuit have found a sufficient issue of material fact precluding summary judgment where Plaintiff "identif[ies]

individuals who were present during the incident and who may have participated in the alleged assault." *Johnson v. Brown*, 9:20-CV-622, 2022 WL 7288498, at * 23 (N.D.N.Y. May 12, 2022). "A plaintiff may establish an officer's personal involvement through facts suggesting that the officer was either personally involved in the use of force or was present during the use of force and failed to intervene." *Piper v. City of Elmira*, 12 F. Supp. 3d 577, 596 (W.D.N.Y. 2014) (citation omitted). "[P]laintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." *Id.* (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), *aff'd*, 426 F.3d 549 (2d Cir. 2005)).

Plaintiff has more than satisfied this standard. Both parties agree that each of the Defendants were present for the alleged assault and/or used force against Plaintiff. *See generally* Dkt. No. 59-12. As such, Plaintiff's claims may not be dismissed purely due to lack of personal involvement.

### C.  Applicable Protection – Fourteenth or Eighth Amendment

Next, the parties dispute whether Plaintiff's claims should proceed under the Eighth or Fourteenth Amendment. Dkt. No. 48-22 at 12-14; Dkt. No. 59-13 at 13-14. An Eighth Amendment excessive force claim is available to those taken into the state's custody and requires that a plaintiff prove: (1) subjectively, that in applying force, the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) ("the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm" (internal quotation marks omitted)).

In contrast, "[t]he Fourteenth Amendment's 'Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.'"   *Gerard v. City of New York*, 843 F. App'x 380, 382 (2d Cir. 2021) (summary order) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)); *see also Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (explaining that pretrial detainees claims proceed under the due process clause because they "may not be punished in any manner—neither cruelly and unusually nor otherwise" (internal quotation marks omitted)).   To succeed on a Fourteenth Amendment excessive force claim, Plaintiff must "show only that the force purposely or knowingly used against him was objectively unreasonable." *Correa v. Lynch*, 20-CV-02875, 2021 WL 2036697, at *7 (S.D.N.Y. 2021) (quoting *Kingsley*, 576 U.S. at 396-97)).   Notably, the Fourteenth Amendment does not require a showing of subjective bad faith and wantonness.

Here, Plaintiff was incarcerated as a parole violator.  Dkt. No. 48-21 at ¶ 2.  "The Second Circuit has not yet determined whether individuals incarcerated for parole violations are protected by the Eighth Amendment or the Fourteenth Amendment." *See Pearson v. Gesner*, 21-CV-05670, 2022 WL 1523166, at *4 n.9 (S.D.N.Y. 2022) (citing *Horace v. Gibbs*, 802 F. App'x. 11, 14 (2d Cir. 2020) (summary order)).  However, several district courts in this circuit have determined that where the plaintiff is "detained for allegedly violating the terms of a sentence imposed in an unspecified federal prosecution" the Fourteenth Amendment applies because such plaintiffs "resemble[] more closely a pretrial detainee than a convicted prisoner." *Brooks v. Westchester Cty. Jail*, No. 19-CV-10901, 2021 WL 3292229, at *5 (S.D.N.Y. Aug. 2, 2021); *see also Griffith v. AMKC Rikers Island*, No. 1:21-CV-0386 (LLS), 2021 WL 848103, at *3 (S.D.N.Y. Mar. 4, 2021); *Smith v. Fricke*, 9:17-cv-0244 (TJM/TWD), 2019 WL 4602973, at *12 (N.D.N.Y. Aug. 7, 2019), *report & recommendation adopted in part and remanded on other grounds sub nom.*, *Smith*

*v. Russo*, No. 9:17-CV-0244, 2019 WL 4602140 (N.D.N.Y. Sept. 23, 2019); *Horace v. Gibbs*, 14-CV-655S, 2017 WL 4344435, at *5 (W.D.N.Y. Sep. 29, 2017), *aff'd Horace*, 802 F. App'x. at 14.[3]

Courts are especially prone to apply the Fourteenth Amendment to a parole violator's claims where, "it is not clear from the record . . . whether a disposition had been reached regarding the . . . parole violations." *Smith*, 2019 WL 4602973, at *12; *see also Hill v. County of Montgomery*, 9:14-cv-00933, 2018 WL 2417839, at *2 (N.D.N.Y. May 29, 2018). Here, it is not clear from the record whether Plaintiff's parole violation was ruled upon prior to the incident in question. *See* Dkt. No. 48-21 at ¶¶ 2-3 (attesting to a parole hearing but failing to state whether Plaintiff was found guilty of the parole violation); Dkt. No. 48-12 at 39:23-41:11 (Plaintiff attesting to a written decision on his parole violation but failing to identify the timing or nature of that decision). Therefore, the Court applies the Fourteenth Amendment standard to Plaintiff's claims, and Plaintiff's claims under the Eighth Amendment are dismissed as improper as a matter of law.[4]

---

[3] Defendants' cases to the contrary predate the Second Circuit's most recent statement on the issue as well as district court cases which apply the Fourteenth Amendment. *See Towsley v. Frank*, No. 5:09-cv-23, 2010 WL 5394837, at *6 (D. Vt. Dec. 28, 2010); *Walton v. Breevear*, 9:05-CV-0194 (LEK/DEP), 2007 WL 446010, at n. 16 (N.D.N.Y. Feb. 8, 2007); *Martin v. Vermont Dep't of Corr.*, No. 1:03-CV-240, 2005 WL 1278119, at *7 n.3 (D. Vt. May 25, 2005) (citing 5th Circuit precedent). Moreover, *Walton* specifically acknowledges the possibility that the Fourteenth Amendment would apply if plaintiff's parole status had yet to be formally revoked after a second sentencing. 2007 WL 446010, at *8 n.16. And *Martin* relied on 5th Circuit precedent in its application of the Eighth Amendment. 2005 WL 1278119 at *7 n.3.

[4] Plaintiff's Complaint asserts claims under both the Eighth and Fourteenth Amendments for identical conduct. Dkt. No. 1 at 5. However, Plaintiff acknowledges that his separate claims are instead alternatives of one another depending on the form of constitutional protection to which Plaintiff is entitled. *See* Dkt. No. 59-13 at 14. In dismissing the Eighth Amendment claims as improper, the Court makes no judgment on whether the claims would survive summary judgment.

### D. Excessive Force

Again, to succeed under the Fourteenth Amendment, Plaintiff must "show only that the force purposely or knowingly used against him was objectively unreasonable." *Brooks*, 2021 WL 3292229, at *5 (citing *Correa*, 2021 WL 2036697, at *7). Plaintiff must also demonstrate an injury, though "the Second Circuit has indicated that a very minimal injury is sufficient to trigger potential liability." *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 390 (S.D.N.Y. 2009) (citing *Robison v. Via*, 821 F.2d 913 (2d Cir. 1987) (finding allegations that Plaintiff was "yanked" and had her arm twisted behind her back sufficient despite no allegations of medical treatment)). Defendants do not dispute that the uses of force in question were "purposeful" or "deliberate." *See generally* Dkt. No. 48-21. Nor can they reasonably dispute Plaintiff has suffered sufficient injury. *See* Dkt. No. 59-13 at 18 (alleging injuries of eye laceration and a traumatic brain injury); *id.* at 22 (detailing punches to the head); Dkt. No. 59-12 at ¶ 118 (agreement that Plaintiff had to be treated for pepper spray); *see also Mickle v. Morin*, 297 F.3d 114, 120–21 (2d Cir. 2002) (citing cases).

Therefore, the only issue to be resolved is whether Plaintiff could plausibly show the force used was objectively unreasonable. To do so, Plaintiff must establish "that the force was not rationally related to a legitimate governmental objective or . . . [was] excessive in relation to that purpose." *France v. Morton*, No. 12-CV-05576, 2018 WL 1276860, at *9 (S.D.N.Y. Mar. 9, 2018) (internal quotation marks omitted). The Court must evaluate this question "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Brooks*, 2021 WL 3292229, at *6 (quoting *Kingsley*, 576 U.S. at 397). The Court considers the following factors:

> the relationship between the need for the use of force and the amount of force used;
> the extent of the plaintiff's injury; any effort made by the officer to temper or to

> limit the amount of force; the severity of the security problem at issue; the threat
> reasonably perceived by the officer; and whether the plaintiff was actively resisting.
> The factfinder must also take account of the legitimate interests in managing a jail,
> acknowledging as part of the objective reasonableness analysis that deference to
> policies and practices needed to maintain order and institutional security is
> appropriate.

*Frost v. New York City Police Dep't*, 980 F.3d 231, 252 (2d Cir. 2020) (internal citations and

quotation marks omitted).

Here, Plaintiff has shown several issues of material fact which could lead a reasonable juror

to conclude Defendants Poole, Livreri, Dollard, and Cohen's use of force was unreasonable.[5]

Ultimately, two vital questions of material fact remain which might determine the success of

Plaintiff's claims against each of these Defendants: (1) whether Plaintiff was complying with the

relevant orders when Defendant Poole initially brought him to the ground, and (2) whether Plaintiff

was actively resisting or already under control and confined when the remaining Defendants used

force while he was on the ground.  *See, e.g., Benny v. City of Long Beach*, 22-1863, 2023 WL

8642853, at *2 (2d Cir. 2023) (holding officers may not use excessive force before allowing a

plaintiff the opportunity to comply with an order); *Tracy v. Freshwater*, 623 F.3d 90, 98-99 (2d

Cir. 2010) (denying summary judgment where significant force was possibly used "against an

arrestee who is complying with police commands or otherwise poses no immediate threat to the

arresting officer"); *Rogoz v. City of Hartford*, 796 F.3d 236, 247-48 (2d Cir. 2015) (finding triable

issue where jury might find that defendant jumped on his back while plaintiff was complying and

lying on the ground); *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (denying summary judgment

where an issue of fact existed as to whether defendants punched plaintiff in the face while plaintiff's

---

[5] Again, Plaintiff chooses not to oppose the excessive force claims against the remaining
Defendants.  *See* Dkt. No. 59-13 at 16-26.  The Court agrees that the record reveals that there is
no issue of material fact capable of sustaining those claims and dismisses them from the case.

arms were shackled).  These questions, along with the defendant-specific questions identified below, preclude summary judgement on the remaining excessive force claims.

**Defendant Poole.**  First, Plaintiff has identified material issues of fact as to whether Defendant Poole's use of force was excessive.  Defendant Poole's use of force indisputably included bringing Plaintiff to the ground at the top of the staircase.  Dkt. No. 48-21 at ¶ 45; Dkt. No. 59-12 at ¶ 45.  Plaintiff also asserts Defendant Poole stepped on Plaintiff's head and placed his entire hand over Plaintiff's face while he was on the ground.  Dkt. No. 59-12 at ¶ 56.

First, regarding Defendant Poole's initial action in bringing Plaintiff to the ground, a jury could find there was no need for the use of force at all, or in the alternative, that the need was so minor as to make the force unjustified.  Despite Defendants' assertions to the contrary, Plaintiff insists that though he did "question the legitimacy of Poole's order," he did not threaten Defendant Poole and always intended to comply with the order to return to his cell.  Dkt. No. 59-13 at 17 (citing Dkt. No. 59-12 at ¶¶ 25-45).  Video evidence demonstrating Plaintiff walking toward his cell prior to Defendant Poole's initial use of force, at the very least, creates a question of fact as to whether Plaintiff's actions evidenced an obvious intention to comply with Defendant Poole's order.  *Id.* (citing Dkt. No. 59-12 at ¶¶ 35-39).  In fact, the video evidence all but contradicts Defendants' version of events; a jury may find that it was Defendant Poole that approached Plaintiff aggressively during their disagreement regarding the order.  *Id.*  Second, regardless of the need for force, Defendant Poole's actions in approaching Plaintiff and pulling out his taser could convince a reasonable juror that Defendant Poole did not attempt to mediate the situation, but instead, purposefully took actions which inflamed tensions.  Third, the presence of other incarcerated individuals in the vicinity of the incident might have increased the severity of the security problem at issue, Dkt. No. 48-21 ¶ 33, or at least Defendant Poole's perception of the

security problem. However, it remains the case that a reasonable juror could find Plaintiff presented no security threat at all. Indeed, the record suggests that even had Plaintiff threatened to "shove [the] taser in [Defendant Poole's] ass," the perceived security threat would be minimal given Defendant Poole's control over the taser. *Id.* at ¶¶ 31-32. Fourth, there is at least a question of fact as to whether Plaintiff actively resisted the order to return to his cell or the orders to place his arms behind his back, *see* Dkt. No. 59-12 at ¶¶ 35-39. Finally, though "the legitimate interests in managing a jail" weigh in favor Defendant Poole, those interests are insufficient to overcome the remaining factual issues regarding the existence and severity of the purported security threat and would be undermined by a jury's finding that Plaintiff was indeed returning to his cell. These questions of fact are determinative of the lawfulness of Defendant Poole's conduct. Therefore, this Court cannot find that Defendant Poole's conduct complied with Plaintiff's Fourteenth Amendment rights as a matter of law and denies the Motion as to Plaintiff's claim of excessive force against Defendant Poole.

**Defendant Livreri**. When Defendant Livreri arrived at the scene of the incident, Plaintiff was already on the ground and being restrained by two other officers. Dkt. No. 48-21 at ¶ 68. It is undisputed that Defendant Livreri pepper sprayed Plaintiff multiple times after Plaintiff was thrown to the ground by Defendant Poole, though there appears to be an issue of fact as to how many times he sprayed Plaintiff. Dkt. No. 59-12 at ¶¶ 68-69; Dkt. No. 48-21 at ¶¶ 69-71. Both parties also agree that Defendant Livreri gave Plaintiff advance notice of his intention to use pepper spray, though Plaintiff asserts he could not comply with Defendant Livreri's warning because he was restrained on the ground. *Id.* Plaintiff additionally alleges Defendant Livreri kneeled on him multiple times while he was already restrained. *Id.* ¶ 70.

A reasonable juror could find that Defendant Livreri's use of force was unreasonable.  First, the need for force at the time Defendant Livreri arrived at the incident was greater than the need for Defendant Poole's initial use of force as there was an active physical altercation between an incarcerated individual and officers.  However, that need was limited by the fact that Plaintiff was already being held to the ground by the two officers, and the amount of force used is a disputed question of fact.  Therefore, a reasonable juror could find that the amount of force used outweighed the need for force.  *See Tracy*, 623 F.3d at 98 (denying summary judgment in part based on a factual dispute regarding the distance from which the pepper spray was deployed).  Second, Defendant Livreri's "warning" before using pepper spray could be seen by a jury as an effort to temper the amount of force necessary, though Plaintiff asserts the warning was hollow as he had no way of complying.  Third, there is similarly a question of fact as to whether the Plaintiff was actively resisting while on the ground by holding his arms under his body.  Plaintiff argues his position was meant to protect himself from the assault and did not constitute active resistance, nor did he have the mobility to resist.  Dkt. No. 59-12 at ¶ 68.  In all, there are several issues of material fact which preclude the Court from finding that Plaintiff's claim for excessive force against Defendant Livreri fails as a matter of law.

**Defendant Dollard**.  The parties do not dispute that when Defendant Dollard arrived on the scene, a group of officers was already present.  Dkt. No. 48-21 at ¶¶ 87-88; Dkt. No. 59-12 at ¶ 89.  Similarly, there is no dispute that the officers were telling Plaintiff to "stop resisting" when Defendant Dollard joined the group.  Dkt. No. 48-21 at ¶ 88; Dkt. No. 59-12 at ¶ 88.  Finally, the parties agree that Defendant Dollard held Plaintiff's head still while he was on the ground, though Plaintiff asserts he did so by kneeling on his head.  Dkt. No. 48-21 at ¶ 92; Dkt. No. 59-12 at ¶ 92.

A reasonable juror could find Defendant Dollard's use of force was unreasonable.  First, undoubtedly, an altercation involving officers and an incarcerated individual presents a security concern.  However, Defendant Dollard admits that there were at least "5-6 corrections officers in the immediate area" surrounding Plaintiff and that Plaintiff was "on the ground face down" when he arrived.  *Id.* at ¶¶ 90-93.  Therefore, the security concern was arguably less severe than that faced by Defendant Livreri, who arrived earlier in the altercation.    Second, Plaintiff asserts that video evidence reveals Defendant Dollard saw another officer holding and punching Plaintiff's head and that his head was already still on the floor when Defendant Dollard kneeled on his head. Dkt. No. 59-12 at ¶ 92.  A jury could therefore find Defendant Dollard's use of force was redundant and unnecessary to securing Plaintiff's compliance.  Regardless, Defendant Dollard's exact use of force is still up for debate, and thus, a jury could find it was disproportionate to the needs of the security concern.  As a result, there are material issues of fact remaining which preclude summary judgment as to the excessive force claim against Defendant Dollard.

**Defendant Cohen**.  Finally, the parties agree Defendant Cohen arrived at the incident while other staff were attempting to handcuff Plaintiff.  Dkt. No. 48-21 at ¶ 97; Dkt. No. 59-12 at ¶ 97.  Defendant Cohen then delivered hand strikes to Plaintiff's torso and left arm.  Defendant Cohen asserts Plaintiff was resisting efforts to be handcuffed and that he believed Plaintiff was possibly reaching for a weapon.  Dkt. No. 48-21 at ¶ 100.

Again, there are material issues of fact to be resolved.  A reasonable juror could find the presence of several other officers limits the severity of the security threat and lowers the need for the use of force.  Similarly, the use of punches could be seen as too severe a form of force in relation to the need to pull Plaintiff's hands behind his back.  Though Defendant Cohen asserts he thought Plaintiff might have a weapon, which would heighten the severity of the security threat,

no other Defendant has attested to that fact, and the record is devoid of any reason to believe Plaintiff might have been armed.  The reasonableness of such a belief for an officer on the scene is for the jury to determine.  Finally, though Defendant Cohen yelled "stop resisting" and "give up your hands" while Plaintiff was on the ground, a reasonable juror could find that such orders were insufficient attempts at mediating the need for force.  Therefore, the Court denies summary judgment on the claim of excessive force against Defendant Cohen.

### E.  Failure to Intervene

"[A]n official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his or her presence by other officers." *Cicio v. Graham*, 9:08-CV-524 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010) (citations omitted).[6]  To succeed on a failure to intervene claim, a plaintiff must prove that: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene." *Sanders v. Torres*, No. 9:19-CV-697 (GTS/CFH), 2021 WL 799263, at *13 (N.D.N.Y. Feb. 8, 2021), *report and recommendation adopted*, 2021 WL 797014 (N.D.N.Y. Mar. 2, 2021) (internal quotations and citations omitted); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue

---

[6] Though many of the cases cited deal with a failure to intervene in relation to an Eighth Amendment excessive force claim, the law makes liable officers who fail to intervene in response to "any resulting constitutional deprivation." *Animashaun v. Toohill*, 9:21-cv-00372-MAD-TWD, 2023 WL 6546069, at *5 (N.D.N.Y. June 22, 2023).

21

of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise").[7]

Here, there are several issues of material fact which preclude summary judgment on the failure to intervene claims against Defendants Furbeck, Lyman, Gettings, Haley, and in the alternative, Livreri, Dollard, and Cohen.  While most of the Defendants were not present for the initial conversation between Defendant Poole and Plaintiff, Defendant Furbeck was nearby.  Should a jury find that Plaintiff made no threat and was complying with Defendant Poole's order to return to his cell when Defendant Poole brought him to the ground, Defendant Furbeck could be found to have had the opportunity to intervene and prevent the altercation from escalating.  *See McCoy v. Goord*, 255 F. Supp. 2d 233, 262 (S.D.N.Y. 2003) (using proximity to determine whether defendant could have intervened).  Moreover, while the remaining Defendants could not possibly have intervened to prevent the initial use of force by Defendant Poole, a jury could find that a reasonable officer would intervene to prevent the punching, kneeing, and use of pepper spray while Plaintiff was on the ground and arguably restrained by several other officers.  *See Animashaun*, 2023 WL 6546069, at *5; *see also Lewis v. Mollete*, 752 F. Supp. 2d 233, 244 (N.D.N.Y. 2010) (noting plaintiff was already "fully restrained" and thus bystanders could be found to have failed to intervene against subsequent uses of force); *Thomas v. Dep't. of Correction*, 3:23-cv-1681 (SVN), 2024 WL 1658460, at *5 (D. Conn. Apr. 17, 2024) (same).  Jurors will need to determine

---

[7] Defendants' assertion that Plaintiff raised only "an excessive force claim under the Eighth & Fourteenth Amendment[s]" in the Complaint, and therefore, cannot pursue a failure to intervene claim is baseless. Dkt No. 60 at 9.  The Eighth Amendment claim in the Complaint is for "cruel and unusual punishment," Dkt. No. 1 ¶ 31, and Plaintiff explicitly alleges that "[e]ach of the defendants observed portions of the illegal and unconstitutional actions of her fellow officers towards plaintiff, each had reasonable opportunities to intervene to prevent and/or stop those actions, and each deliberately *failed to intervene*." *Id*. ¶ 24 (emphasis added).  Accordingly, Defendants cannot seriously contend that they were not on notice of these claims.  Defendants' caselaw is inapposite to the instant Complaint and dispute, *see, e.g.*, Dkt. No. 60 at 10.

at what point it became clear, if ever, that Plaintiff no longer presented an active threat or security concern, and thus, when the use of force would be an obvious constitutional violation to the officers present. These issues prevent the granting of summary judgment on the failure to intervene claims.[8]

### F. Qualified Immunity

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (*per curiam*) (internal quotation omitted). Its application requires the Court's consideration of two questions: whether "(1) ... the official violated a statutory or constitutional right, and (2) ... the right was 'clearly established' at the time of the challenged conduct." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)). The law does not require "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Here, the first question, whether Defendants violated Plaintiff's constitutional rights, is an issue of fact to be determined by the jury. This alone precludes summary judgment on qualified immunity. *See Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) ("[t]he parties' versions of the material facts differ markedly on these issues" thus "preclud[ing] summary judgment on the defense of qualified immunity") (citation omitted). However, should the jury determine a

---

[8] Though pled in the alternative, the Court will allow both the excessive force and failure to intervene claims to proceed against Defendants Livreri, Dollard, and Cohen. That an excessive force claim survives summary judgment does not preclude simultaneous claims for failure to intervene. *See Thomas*, 2024 WL 1658460 at *5. However, Plaintiff has not argued a failure to intervene claim in the alternative for Defendant Poole, and thus, the only claim remaining against Defendant Poole is for the direct use of excessive force. Dkt. No. 59-13 at 26.

constitutional violation did take place, there is binding precedent which prohibits "significant force against an arrestee who is no longer resisting and poses no threat to the safety of officers or others." *Jones*, 963 F.3d at 225 (citing *Tracy*, 623 F.3d at 98-99). Indeed, there is also law that bars officers from using excessive force before allowing a plaintiff the opportunity to comply with an order. *See Benny v. City of Long Beach*, 22-1863, 2023 WL 8642853, at *2 (2d Cir. Dec. 14, 2023) (citing *Rogoz*, 796 F.3d at 240-41, *O'Hara v. City of New York*, 570 F. App'x 21, 23 (2d Cir. 2014), and *Calamia v. City of New York*, 879 F.2d 1025, 1035 (2d Cir. 1989)). The Court therefore denies Defendants' motion for summary judgment to the extent it relies upon qualified immunity.

## V.    CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendants' Motion, Dkt. No. 48, is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** Plaintiff's First Amendment claims against Defendant Poole and Defendant Furbeck, are **DISMISSED**; and the Court further

**ORDERS** Plaintiff's Eighth Amendment excessive force claims against Defendant Furbeck, Defendant Lyman, Defendant Gettings, and Defendant Haley are **DISMISSED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 10, 2024
    Albany, New York

*Anne M. Nardacci*
Anne M. Nardacci
U.S. District Judge